

**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: May 24, 2013.**

_____
**H. CHRISTOPHER MOTT**
**UNITED STATES BANKRUPTCY JUDGE**
_____

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| LMR, LLC | § | CASE NO.  12-12267-HCM |
| *d/b/a Baymont Inn & Suites Austin South* | § | (Chapter 11) |
| | § | |
| Debtor. | § | |

### OPINION REGARDING
### CONFIRMATION OF PLAN OF REORGANIZATION

> ***"The great advantage of a hotel is that it is a refuge from home life."***
> – George Bernard Shaw

This case involves a Chapter 11 debtor hotel owner that experienced financial difficulties as the result of the unexpected loss of its prior franchise and the nationwide recession. In a remarkable turnaround, this debtor has been able to recover during its bankruptcy case due to a rising Austin hotel market that is increasing its revenue and value. As more people travel to Austin to engage in leisure pursuits—whether it be to see live music, watch independent films, attend college football games, or experience a new racetrack that is close by—a segment of these out-of-towners are taking "refuge from home life" at the debtor's limited service hotel. As a result, in a difficult (but not unprecedented) legal setting, this particular Chapter 11 debtor can successfully cramdown its plan of reorganization on an objecting secured creditor that recently acquired the debtor's loan.

1

# I.
## INTRODUCTION

### A. Confirmation Hearing and Opinion

On April 25, 2013, the Court conducted a confirmation hearing regarding the First Amended Plan of Reorganization, as amended by the Second Amended Plan of Reorganization, and as modified by the Modified Second Amended Plan of Reorganization (dkt# 73, 92, 102) ("Plan") filed by LMR, LLC d/b/a Baymont Inn & Suites Austin South ("Debtor"), and the objection thereto filed by its lender, Asset Ventures Fund I, Ltd. ("AVF").

This Opinion constitutes the Court's findings of fact and conclusions of law with respect to confirmation of the Plan in accordance with Bankruptcy Rules 7052(a)(1) and 9014(c).[1] In reaching the findings and conclusions set forth in this Opinion, the Court has considered and weighed all the evidence, testimony, admitted exhibits, arguments of counsel, and pleadings and briefs filed by all parties with respect to the Plan, regardless of whether or not they are specifically referred to in this Opinion.[2]

### B. Jurisdiction

The Court has jurisdiction over the confirmation of the Plan under 28 U.S.C. §§157 and 1334. Confirmation of the Plan arises in and under a bankruptcy case referred to this Court by the Standing Order of Reference entered in this District. The contested matter regarding confirmation of the Plan is a "core" proceeding pursuant to 28 U.S.C. §§157(b)(2)(L). The Court is authorized to enter a Final Order with respect to confirmation of the Plan.

---

[1] To the extent any finding of fact is construed to be a conclusion of law in this Opinion, they are hereby adopted as such. To the extent any conclusion of law is construed to be a finding of fact in this Opinion, they are hereby adopted as such.

[2] Cents (pennies) are intentionally omitted by the Court in the dollar figures used in this Opinion. Sense, however, is not intentionally omitted.

## II.
## PROCEDURAL BACKGROUND

### A. Bankruptcy Case—Procedural Background

On October 2, 2012, LMR, LLC (herein "Debtor") filed a voluntary petition under Chapter 11 of the Bankruptcy Code. The Debtor owns and operates the Baymont Inn & Suites Austin South ("Baymont Hotel") located at 4323 South IH-35, Austin, Texas, 78744.

Asset Ventures Fund I, Ltd. (herein "AVF") is the Debtor's lender and secured creditor. AVF holds a claim against the Debtor for approximately $3.8 million, secured by the Baymont Hotel owned by the Debtor.

On October 2, 2012, the Debtor filed a Motion to Authorize Use of Cash Collateral of AVF (dkt# 4). On October 10, 2012, the Court entered an Interim Order authorizing use of cash collateral with a budget, which was extended by stipulation filed by the parties and announcement by the parties made in Court on February 11, 2013 (dkt# 10, 20).

On December 18, 2012, AVF filed its Motion for Relief from the Automatic Stay, seeking to foreclose on the Baymont Hotel (dkt# 30). The Court reset the final hearing on the Motion for Relief at the request of the parties. On February 11, 2013, the Court held a contested hearing on AVF's Motion for Relief. Following the hearing, the Court entered an Order requiring the Debtor to make adequate protection payments of $23,750 a month to AVF ("Adequate Protection Order") until the Court either granted or denied confirmation of the Debtor's proposed plan of reorganization (dkt# 64). The Adequate Protection Order further provided that the automatic stay would remain in place unless: (a) confirmation of the Debtor's proposed plan of reorganization was denied; (b) the Debtor's members failed to deposit $200,000 into escrow by the date of the confirmation hearing on the Debtor's proposed plan of reorganization; (c) Baymont Franchise Systems, Inc. terminated its franchise agreement with the Debtor; (d) the Debtor failed to repair one of the elevators at the Property to meet City Code by March 1, 2013; or (e) the Debtor failed to make an adequate protection payment to AVF. As of the date of the Plan confirmation hearing, the Debtor was in compliance with the Adequate Protection Order.

Baymont Franchise Systems, Inc. is the franchisor of the Baymont hotel franchises and marks ("Baymont Franchisor"). On January 10, 2013, Baymont Franchisor filed its Motion for Relief from Stay (dkt# 35). The Debtor and Baymont Franchisor resolved such Motion for Relief through an Agreed Order entered by the Court on February 5, 2013 (dkt# 62).

### B. Plan of Reorganization—Procedural Background

On January 21, 2013, the Debtor filed a proposed Plan of Reorganization and a proposed Disclosure Statement with respect to such Plan (dkt# 40, 41). On March 1, 2013, the Debtor filed a First Amended Plan of Reorganization and accompanying Disclosure Statement with respect to such First Amended Plan of Reorganization (dkt# 73, 74). Following a hearing on March 4, 2013 on approval of such Disclosure Statement, the Debtor filed an Amended Disclosure Statement on March 13, 2013 ("Amended Disclosure Statement") (dkt# 84, 85). The Court entered an Order approving the Amended Disclosure Statement on March 14, 2013, authorizing the Debtor to solicit votes from creditors and interest holders on the Amended Plan of Reorganization, and setting a confirmation hearing on the Debtor's Amended Plan of Reorganization for April 25, 2013 ("Confirmation Hearing") (dkt# 86).

On April 15, 2013, AVF filed its Objection to Confirmation of Debtor's Amended Plan of Reorganization ("Objection") (dkt# 91). AVF was the only creditor that objected to confirmation of the Debtor's Amended Plan of Reorganization. On April 22, 2013, the Debtor filed a Response to the Objection of AVF and Brief in Support (dkt# 97). On April 18, 2013, the Debtor filed its Second Amended Plan of Reorganization (dkt# 92). The Debtor then orally modified its Second Amended Plan of Reorganization at the Confirmation Hearing on April 25, 2013. At the Court's request, the Debtor reduced such oral plan modification to writing by filing its Modified Second Amended Plan of Reorganization on April 29, 2013 (dkt# 102) (herein "Plan").

The Debtor filed its Ballot Summary on April 22, 2013 (dkt# 98), which reported how creditors and interest holders voted on its Amended Plan of Reorganization. The Debtor filed an Amended Ballot Summary on April 24, 2013 (Debtor Ex. 31, dkt# 100) ("Ballot Summary"). AVF was the only creditor that voted to reject the Debtor's Amended Plan of Reorganization; all other voting creditors and interest holders voted to accept such Plan.

4

**III.**
**FINDINGS OF FACT  WITH FACTUAL BACKGROUND**

Five witnesses testified at the Plan Confirmation Hearing: (1) Lisa Rhee ("Ms. Rhee"), the managing member of the Debtor and the manager of the Baymont Hotel; (2) Brian Yauger ("Mr. Yauger"), the owner of Cool Earth Contracting and Coating Roofing Company; (3) Jay Weir ("Mr. Weir"), an Austin hotel real estate broker and consultant; (4) Byron Hinton ("Mr. Hinton"), AVF's real estate appraiser; and (5) Ross Allen ("Mr. Allen"), AVF's representative. The Court admitted into evidence certain exhibits submitted by the Debtor ("Debtor Ex.") and AVF ("AVF Ex.").

### A. Hotel Background

The Debtor was formed as a limited liability company to acquire a hotel in Texas. In September 2007, the Debtor acquired its hotel, which was under the Best Western flag at the time and did business as Best Western Seville Plaza Inn. The purchase price paid by the Debtor for the hotel was approximately $5.7 million. Each of the Debtor's four members contributed approximately $450,000 to the purchase price of the hotel, for a total of about $1.8 million in cash equity contributions. The Debtor financed the remaining $3.9 million of the purchase price through a loan from Wilshire State Bank. The original loan provided for monthly payments of $29,247 on a 25-year amortization with maturity of the loan in 5 years  on September 17, 2012. The Debtor's hotel secures the loan. *See* AVF Proof of Claim (AVF Ex. 4).

The Debtor's hotel receives revenue from its 96 rentable rooms. As a limited service hotel, the Debtor does not operate food or beverage facilities within the hotel. However, the Debtor receives revenue from two restaurants (Saigon restaurant and Subway) that lease space on the hotel property. Both restaurants have leased at this location for over 15 years, with the Saigon restaurant having been a tenant for about 25 years. The Debtor's hotel is also fully insured.

When the Debtor first purchased the hotel in 2007, it was operating as a Best Western franchise. Unfortunately, on March 3, 2010, Best Western terminated the Debtor's franchise as a new Best Western Plus was scheduled to be built at the Austin Airport, approximately 3 miles from the Debtor's hotel. For most of March 2010, the Debtor's hotel was not affiliated with any hotel chain and was doing business as Hotel Austin South. On March 29, 2010, the Debtor entered into a franchise agreement with the Baymont Franchisor (which is part of the Wyndham Hotel group). The Debtor's hotel thereafter became and remains a Baymont franchisee as the Baymont Hotel.

Ms. Rhee, the Debtor's managing member and hotel manager, testified that the hotel's loss of the Best Western flag in 2010 resulted in revenues declining by 40% to 50% because the Debtor spent six months converting to a Baymont/Wyndham property. This conversion included improvements to the hotel and gaining access to Baymont/Wyndham's online reservation system. The Debtor's yearly financial statements demonstrate the 2010 revenue decline. In 2008, the Debtor had gross

income of $1,579,742; in 2009, the Debtor had gross income of $1,177,571; and then in 2010 gross income declined to $919,117 (Debtor Exs. 8, 9, 10). In addition to the loss of the Best Western flag in 2010, the Debtor's hotel revenues also suffered from the effects of the nationwide recession in 2009 and 2010.

Although the Debtor's gross income increased to $1,128,942 in 2011 (Debtor Ex. 11), the Debtor continued to experience financial difficulties, including an unsuccessful attempt to refinance the secured loan on the Baymont Hotel. In May 2012, AVF (a private equity distressed debt investor) acquired the loan originally made by Wilshire State Bank to the Debtor secured by the Baymont Hotel. Shortly thereafter, the loan acquired by AVF matured by its terms in September 2012, and AVF promptly posted the hotel for foreclosure. To preserve the Baymont Hotel and prevent foreclosure, the Debtor filed Chapter 11 bankruptcy on October 2, 2012.

## B. **Post-Bankruptcy Performance**

Since filing for bankruptcy, the Debtor's hotel business has markedly improved, and the evidence presented at the Confirmation Hearing convincingly demonstrated that the business will continue to improve. As a family-owned business, the Debtor appears to be well managed and has recovered from the recession and the loss of the Best Western flag. Despite the Debtor's difficult third quarter in 2012 (a difficult quarter for most Austin hotels), the Debtor's 2012 gross income continued to increase to $1,139,600 (Debtor Ex. 12). The 2013 calendar year has been even better than 2012 for the Debtor, and the Baymont Hotel is projected to have net revenue (after occupancy taxes) of about $1.25 million in 2013. The Debtor has operated profitably while in bankruptcy, even with the monthly adequate protection payments the Court ordered the Debtor to make to AVF and the cost of repairing one elevator. *See* March Monthly Operating Report (Debtor Ex. 7).

During the work week, the Baymont Hotel relies on out-of-town employees working in Austin for much of its customer revenue. On the weekends, the Baymont Hotel attracts more leisure-oriented, budget-conscious customers interested in nearby attractions around Austin. The strongest revenue months for the Baymont Hotel tend to be in the spring and summer because of numerous major events in the Austin area. The weakest revenue months for the Debtor's hotel (like most hotels) tend to be in December and January.

In large part, the increase in the Baymont Hotel's revenue can be attributed to the improving and strong local Austin economy and the recently "rising" Austin hotel market. Major events in Austin, including at the new Circuit of the Americas racetrack—which the Baymont Hotel is one of the closest hotels to—have spurred on the rising hotel market. In addition to multiple new events at the nearby Circuit of the Americas racetrack, Ms. Rhee testified that other Austin events that attract leisure travelers on a budget include Austin City Limits, South by Southwest, The University of Texas football games, Texas Relays, and graduation ceremonies for The University of Texas and St. Edwards University, which will contribute to strong hotel revenues. As one example of

6

the hotel revenue generated by major events and the Debtor's recent use of "dynamic pricing" to improve profitability, Ms. Rhee explained that while the Baymont Hotel's normal room rate is $90/night, it increased in November to $399/night during the weekend of the inaugural Formula One race at the Circuit of the Americas racetrack.

Mr. Weir, a very experienced Austin hotel broker and consultant specializing in the sale and financing of hotel real estate, testified at the Confirmation Hearing. Mr. Weir is very familiar with the Baymont Hotel, having served as a broker for the past two sales of the hotel. Mr. Weir testified that there is a direct correlation between the strength of the hotel market and the strength of the local economy. One reason this is true is because an increase in business activity results in more business travelers who stay in hotels during the workweek. As evidence of the strong Austin local economy, the Debtor demonstrated that new home construction increased by 27% in the first quarter of 2013, commercial occupancy rates are up to 87.3% from 84.4% last year, and apartments' occupancy rates have hit an all-time high for Central Texas (Debtor Exs. 25, 26, 27).

Mr. Weir credibly testified that Austin is in the midst of a tremendously "rising" hotel market that started to accelerate in the fourth quarter of 2012. Mr. Weir pointed the Court to recent articles and statistics showing that occupancy and room rates were up in Austin during 2012 compared to 2011, and describing a recent Austin hotel "boom" of 4,000 new rooms planned for construction in downtown Austin (Debtor Ex. 28). Mr. Weir made it clear that the new downtown hotels will not directly compete with the Baymont Hotel because they are much more expensive and are in a different location, and therefore will not result in lost business for the Baymont Hotel.

Mr. Weir also cited to very persuasive and independent statistics from the Texas Hotel Performance Factbook. This Performance Factbook compiles data from the Texas State Comptroller with respect to Texas hotels, as well as Austin area hotels and even the specific zip code area where the Baymont Hotel is located. According to these independent statistics, in the fourth quarter of 2012: (a) Austin hotel revenues increased 28.1% over the fourth quarter of 2011; (b) Austin hotel room occupancy increased from 59.6% to 69.3%; and (c) the RevPar (revenue per available room per day) of Austin hotels increased by $15.85 (Debtor Ex. 20, p. 8). More specifically, in the zip code where the Debtor's Baymont Hotel is located (78744), these independent statistics demonstrated that in fourth quarter 2012: (a) hotel revenues increased 28.9%; (b) hotel room occupancy increased from 64.8% to 76%; and (c) RevPar of these hotels increased by $18.70. These independent statistics also confirmed that the revenues of the Debtor's Baymont Hotel in the fourth quarter of 2012 (a) increased 19.1%; (b) its room occupancy increased from 52.7% to 65.2%; and (c) its RevPar increased $5.30 compared with the fourth quarter of 2011 (Debtor Ex. 20, p. 15).

Overall, 2012 was a much stronger year for Austin hotels than 2011, with an obvious improvement beginning in the fourth quarter of 2012 (Debtor Exs. 20, p. 8; 24, p. 8). Looking at even more recent data, Mr. Weir testified that the Baymont Hotel's 2013 revenues year-to-date compared to 2012 are up 16.5% and its RevPar is up 8%.

The Court found Mr. Weir's testimony to be very credible and backed up by independent statistics and his significant experience in the Austin hotel real estate market.

### C. Plan Financial Projections/Cash

To support the Debtor's Plan, Ms. Rhee (hotel manager) generated two sets of 5-year financial expense projections: (1) the first set based on the assumption that AVF has a $3.2 million secured claim and an approximately $615,000 unsecured claim treated under the Plan; and (2) the second set based on the assumption that AVF has a fully secured $3.8 million claim treated under the Plan (Debtor Ex. 4).

Two sets of Plan expense projections were necessary, as the value of AVF's collateral (the Baymont Hotel)—which would dictate how AVF's claim would be treated and paid under the Plan—was contested. AVF filed a Proof of Claim setting forth that the Debtor owed $3,815,355 as of the bankruptcy filing date, and that the value of its collateral was $3.2 million. *See* AVF Proof of Claim (AVF Ex. 4). As of the Confirmation Hearing on April 25, 2013, the Debtor had made three adequate protection payments to AVF of $23,750, that were due on February 15, March 15, and April 15, 2013 under the Adequate Protection Order. A fourth adequate protection payment of $23,750 became due on May 15, 2013 after conclusion of the Confirmation Hearing, which the Court directed the Debtor to make. As set forth below, the Court will conclude that AVF is undersecured and it has an allowed secured claim of $3.2 million, with the balance of its claim treated as unsecured under the Plan. After reducing the amount of AVF's Proof of Claim as of the bankruptcy filing date ($3,815,355) by the amount of four adequate protections payments made to AVF during the bankruptcy of $23,750 (total of $95,000), the Debtor currently owes AVF the amount of about $3,720,355.[3] Of this outstanding amount, AVF has a secured claim of $3.2 million under the Plan, and an unsecured claim of about $520,355 under the Plan.

The Debtor's Plan projections show that, including the $200,000 equity infusion by the Debtor's members, by May 2013 (the projected Plan effective date) the Debtor will have $473,726 in cash on hand (Debtor Ex. 4). In addition, the Debtor will also have the amount of $70,558 in escrow to upgrade the hotel's second elevator (estimated to cost $38,000) and to pay 2013 property taxes when due.

The cash position of the Debtor has improved dramatically in the 7 months that it has been in Chapter 11 bankruptcy. The Debtor started with a negative cash position on the date of its bankruptcy filing, which has now grown to over $300,000 in cash on hand as of the Confirmation Hearing (Debtor Exs. 7, 14). This positive cash flow is after making monthly adequate protection payments to AVF of $23,750 per month since February, upgrading one elevator so that it passes City inspection, and paying all bills

---

[3] All dollar figures in this Opinion with respect to the amount of AVF's claim, as well as payments to be made to AVF under the Plan, are approximate figures and will not bind either party in any subsequent claims objection or allowance litigation. Hopefully claim's litigation will be unnecessary, as the Court has made every effort to be accurate in these calculations so that it can determine whether the Debtor's Plan is confirmable.

as they became due for post-bankruptcy operation of the hotel.

Ms. Rhee testified that the Debtor will use the $200,000 in members' equity contributions made under the Plan to improve and refurbish the Baymont Hotel, including repainting the hotel's exterior, replacing furniture, and recovering the roof. Mr. Yauger, the owner of Cool Earth Contracting and Coating Roofing Company, testified that it would cost $58,455 to recover the Baymont Hotel's roof (Debtor Ex. 15). Mr. Yauger's estimate was reliable and, based on his explanation, would repair the hotel's roof without the need for an entirely new roof. The Debtor also budgeted $100,000 per year for updating the hotel and ongoing renovation (Debtor Ex. 4). Ms. Rhee testified these updates and renovations would include recarpeting the hotel, installing granite in the bathrooms, updating the pool and deck area, and replacing mattresses. Mr. Weir confirmed that there is a positive correlation between hotel renovations and higher room rates and that hotels get "a lot of bang for their buck" when they complete renovations, especially in a strong rising hotel market such as Austin.

Under the Debtor's Plan projections that assume AVF has an $615,355 unsecured claim that will be paid in full with interest over 5 years and a $3.2 million secured claim, the Debtor estimates that it will have at least $118,848 in cash on hand at the end of the Plan's 5-year term (Debtor Ex. 4). The projected cash on hand at the end of the Plan term would likely be higher, as AVF's unsecured claim to be paid over 5 years with interest is probably closer to the amount of $520,355 calculated above, than the $615,355 used in the Plan projections. AVF's monthly payment of principal and 6% interest on its unsecured claim of about $520,355 should be about $10,062 a month for 5 years. After the Plan's 5-year term ends and the Debtor has paid AVF 60 payments of about $30,679 a month (about $20,617 a month on AVF's secured claim and about $10,062 a month on AVF's unsecured claim), the Debtor will have paid down the principal amount of AVF's debt to approximately $2.8 million—a reduction of almost $1 million in principal (Debtor Ex. 4). And over the course of the Plan term, AVF should receive a total of about $1,840,740 in monthly payments ($30,679 per month times 60 months) from the Debtor.

Overall, the Court finds that the Debtor's Plan revenue projections are conservative, and it is likely the Debtor will meet or exceed its Plan revenue projections. The Debtor's 2013 revenue is already well on pace to exceed its Plan projections revenue for 2013. Ms. Rhee, who prepared the Debtor's Plan projections, has been within the cash collateral budget she prepared during the course of the bankruptcy— where actual income exceeded the Debtor's projected income and actual expenses were about the same as the Debtor's projected expenses (Debtor Ex. 7). Mr. Weir independently corroborated that the Debtor's projected Plan revenues prepared by Ms. Rhee were conservative, and that the Debtor's revenues should exceed such Plan projections. The Court also finds that the Debtor's Plan expense projections are reasonable and realistic, which were also corroborated by Mr. Weir. The Debtor's projected expenses include a relatively modest $60,000 annual salary for Ms. Rhee. Ms. Rhee testified that hiring an offsite management company would cost over $60,000 a year, and would not include the additional cost of an onsite manager like Ms. Rhee.

**D.** **Hotel Location and Value**

The Baymont Hotel is in an excellent location. The hotel sits on 2.3 acres right off the northbound IH-35 exit ramp, is accessible to downtown Austin, and is one of the closest hotels to the new Circuit of the Americas racetrack (about 10 miles). As further evidence of its excellent location, immediately south of the Baymont Hotel are 5 Marriott-brand hotels, in addition to other nearby hotels on both sides of IH-35.

Ms. Rhee actively and competently manages the Debtor's limited service hotel. Before becoming the manager of the Debtor's hotel, Ms. Rhee trained at another hotel. Since the Debtor purchased its hotel, Ms. Rhee has gained further experience in hotel management through numerous Best Western and Baymont conferences, district meetings, online classes, and training seminars as part of the franchisors' continuing education programs.

Although the Baymont Hotel is in average condition—and needs one more elevator upgrade, roof work, and some updating—the Debtor demonstrated that it will have the cash funds to make such repairs and refurbishments during the life of the Plan. Mr. Weir also testified that the Baymont Hotel has "great bones" and is very structurally sound.

Mr. Weir testified that when valuing a hotel in a rising hotel market like the market in Austin, hotel statistics from two years ago are somewhat irrelevant, and it is more relevant to examine projections for the coming year. Based on the Debtor's 2012 and projected 2013 net operating income, Mr. Weir stated that as a broker he would list the Baymont Hotel for sale for about $4.8 million. Mr. Weir also testified that in his opinion the Baymont Hotel would sell in a reasonable period of time for a sales price of $4.5 to $4.8 million. At the Confirmation Hearing, AVF objected to Mr. Weir's testimony regarding the sale price of the Baymont Hotel (but not the list price) under §535.17(b) of the Texas Real Estate Commission Rules and §1101.002(1)(A)(xi) of the Texas Occupations Code. In general, these rules and statutes provide that a broker price opinion must be in writing and contain a written statement that it is a broker price opinion and not an appraisal. Mr. Weir admitted he is not a licensed real estate appraiser. Because Mr. Weir's opinion on the sale price of the Baymont Hotel was not in writing and did not include this written statement, the Court will disregard and not consider Mr. Weir's testimony regarding his opinion of the sales price of the Baymont Hotel.

Mr. Hinton, AVF's appraiser, was the only licensed real estate appraiser that testified at the Confirmation Hearing. Mr. Hinton testified that he has been a real estate appraiser in Texas for 30 years, and has performed 40 to 50 hotel appraisals, including appraising the Debtor's hotel on two occasions. Using both the comparable sales and income approaches, Mr. Hinton valued the Baymont Hotel at $3.2 million as of October 18, 2012 (AVF Ex. 1). In reaching his $3.2 million appraised value, Mr. Hinton used one sale from 2010, three sales from 2011, and one sale from 2012 for his comparable

sales approach. Mr. Hinton used net operating income of $358,400 for his income approach. Mr. Hinton stated that institutional investors would not be interested in the Debtor's hotel and that smaller investors who would possibly purchase the hotel were normally not interested in being in the restaurant business. Thus, in valuing the Baymont Hotel, Mr. Hinton excluded the rental income the Debtor receives from the two restaurants (Subway and Saigon restaurants) on the hotel property.

Although Mr. Hinton admitted that Austin hotels were currently in a "good" market, he stated that nothing major had changed since October 2012 to "dramatically" affect his $3.2 million appraisal of the Baymont Hotel. However, on cross-examination, Mr. Hinton admitted that hotels in Austin have been rising in value since his October 2012 appraisal of $3.2 million. While the Court found Mr. Hinton's demeanor and testimony to be professional and credible, Mr. Hinton used somewhat dated comparable sales and did not factor in the Debtor's recent increase in net operating income. Mr. Hinton's appraisal itself was somewhat outdated because its effective date was over six months ago (October 18, 2012), which is of significance in this case as the evidence and statistics clearly showed that the hotel market in Austin has risen in value since October 2012.

## E. <u>Interest Rate</u>

No true interest rate expert testified at the Confirmation Hearing. Mr. Weir, who is experienced in hotel financing, testified that loans with loan-to-value ratios of 80% debt to 100% value (80/20 loans) currently had interest rates between 4.5% and 5.25%. Mr. Weir testified that the 6% interest rate proposed in the Plan to AVF by the Debtor was a "premium" over the market. But Mr. Weir admitted that no loans exist in the current market with loan-to-value ratios of 100% debt to 100% value or greater (1/1 loans).

Mr. Hinton, AVF's appraiser who also has some experience in financing, agreed with Mr. Weir's testimony that 80/20 loans are available in the current market for 6% interest or less. Mr. Hinton also confirmed that absolutely no loans exist in the current market with a 1/1 ratio or greater. Mr. Hinton also testified that if any such loan could be located, it would only be with a high-risk lender that would charge greater than 6% interest.

Mr. Allen, a representative of AVF with financing experience, in large part echoed Mr. Hinton's market-based loan analysis. Mr. Allen testified that there currently was absolutely no market for a 100% loan-to-value ratio loan (1/1 loan) for income producing real property. According to Mr. Allen, to obtain such a loan would require tiered-financing from a hard money lender consisting of "mezzanine" debt with a percent return in the mid-teens (15-17%) and/or an equity participation that would require a percent return in the mid-to-high 20% range.

Finally, the evidence showed that the current National Prime Rate was 3.25% as of the date of the Confirmation Hearing, and has not changed for over 3 years (Debtor Ex. 32).

## IV.
## CONCLUSIONS OF LAW WITH LEGAL ANALYSIS

### A. Summary of Debtor's Plan and AVF Treatment

In general, the Debtor's Plan proposes to continue the Baymont Hotel's operations. The Debtor proposes to pay off creditors with interest over 5 years through revenues generated by the Baymont Hotel and two restaurant leases on the hotel's property. The Debtor's members will immediately contribute $200,000 in cash as equity for improvements to and refurbishment of the Baymont Hotel and an operating reserve. The Debtor's members (interest holders) will not be entitled to receive any payment or distribution on their insider-claims or membership interests unless and until all creditors are paid. *See* Modified Second Amended Plan of Reorganization filed by the Debtor (herein "<u>Plan</u>") (dkt# 102).

With respect to AVF, the Debtor's Plan proposes to pay the "secured claim" of AVF in 59 monthly payments amortized over 25 years at 6% interest, with a balloon payment of the remaining amount of the secured claim in the 60th month (in 5 years).[4] AVF will retain its lien on the Baymont Hotel and other collateral to secure its claim. All terms of the note and security documents between the Debtor and AVF will continue to apply, except as modified by the Plan. AVF's secured claim is classified and treated in Class 6 of the Plan. *See* Plan (dkt# 102, §6.06).

To the extent that AVF has an "unsecured claim", the Debtor's Plan proposes to pay AVF the amount of its unsecured claim with 6% interest, in 60 equal monthly installments sufficient to pay off the entire unsecured claim with interest in full in 5 years. AVF's unsecured claim is classified and treated in Class 12 of the Plan. *See* Plan (dkt# 102, §6.12). Significantly, AVF will retain its lien on the Baymont Hotel and other collateral to secure payment of both its secured claim and unsecured claim under the Plan. *See* Plan (dkt# 102, §6.06).

If the Debtor defaults on payment of either AVF's secured or unsecured claims under the Plan, AVF will be entitled to pursue its state law remedies (including foreclosure of its lien on the Baymont Hotel). The Debtor will have a short opportunity to cure any such default (5-day cure on monetary defaults, 15-day cure on non-monetary defaults), before AVF can exercise its state law and foreclosure remedies. *See* Plan (dkt# 102, §6.06).

If the Baymont Hotel is sold by the Debtor, sales proceeds will go to pay the entire remaining amount of AVF's secured and unsecured claims (as both will be secured by a lien on the Baymont Hotel) and then other creditors, before any members will receive distributions. *See* Plan (dkt# 102, §7.05(6)).

---

[4] The Plan also provides that the Debtor will use its best efforts to refinance the balloon payment due to AVF in the 5th year of the Plan (dkt# 102, §7.03).

**B. AVF Objection to Plan**

AVF was the only creditor that voted to reject the Debtor's Plan.[5] All other voting creditors and interest holders (including Baymont Franchisor, American Express, the City of Austin, Commercial Tax Group, Great American Leasing, Tejas Elevators, and all four of the Debtor's members) voted to accept the Debtor's Plan. *See* Ballot Summary (Debtor Ex. 31).

AVF was also the only creditor that filed an objection to the Debtor's Plan. *See* AVF Objection to Confirmation of Debtor's Proposed Plan of Reorganization ("Objection") (dkt# 91). In general, through its Objection, AVF contends (a) the Plan is not feasible; (b) the Plan is not proposed in good faith by the Debtor; and (c) the Plan does not satisfy the "cramdown provisions" of §1129(b)(2) of the Bankruptcy Code. AVF contends that the Plan is not feasible because the Debtor cannot meet its Plan financial projections, the $200,000 in member equity contributions are speculative and unfunded, and the Debtor does not have sufficient funds to complete repairs to the Baymont Hotel. AVF also contends that the Debtor cannot make its balloon payment to AVF (which AVF suggests will be $3.35 million) at the end of the Plan's 5-year term. AVF also asserts that the 6% interest rate proposed by the Debtor for AVF is a below market interest rate and therefore does not meet the cramdown requirements of §1129(b)(2) of the Bankruptcy Code. Finally, AVF argues that the Plan was not proposed in good faith as it places the risk on AVF because AVF suggests that only $350,000 of its debt will be amortized and paid down under the Plan.[6]

The Debtor filed its Response to AVF's Objection on April 22, 2013 ("Response") (dkt# 97). In general, through its Response, the Debtor contends that the Plan is feasible because its Plan projections are not speculative and are based on actual recent performance, and it has sufficient funds to pay for repairs to the Baymont Hotel (which are overstated by AVF) with cash on hand. The Debtor further contends it will be able to refinance the AVF debt that balloons within 5 years because its loan-to-value ratio will be much more favorable at that time. With respect to the members' equity contributions to fund the Plan, the Debtor's counsel states that it has the full amount of the $200,000 cash contributions in its trust account awaiting confirmation of the Plan.

For the reasons set forth in this Opinion, the Court finds that the Debtor's Plan should be confirmed and the Objection filed by AVF to the Plan should be denied.

**C. Value and Amount of AVF Secured and Unsecured Claims**

AVF filed a Proof of Claim setting forth that the Debtor owed the amount of $3,815,355 as of the bankruptcy filing date, and that the value of its collateral was $3.2

---

[5] AVF submitted both a ballot to reject the Plan in Class 6 as a secured creditor and a ballot to reject the Plan in Class 12 to the extent it is an unsecured creditor (Debtor Ex. 31).

[6] AVF also asserted some miscellaneous objections regarding the Plan's default language and third party liability, which the Debtor addressed and resolved at the Confirmation Hearing.

million. *See* AVF Proof of Claim (AVF Ex. 4). No party had filed an objection to the AVF Proof of Claim as of the Confirmation Hearing, thus it is allowed in this amount as of the bankruptcy filing date for voting and Plan confirmation purposes. *See* 11 U.S.C. §§502(a), 1126(a).

The Debtor's Plan treats AVF in Class 6 to the extent it has an allowed "secured claim", and in Class 12 to the extent that it has an allowed "unsecured" claim. In simplest terms, a creditor has a "secured claim" to the extent of the value of its collateral, and an "unsecured claim" for any remaining amount not covered by the value of its collateral. In this regard, §506(a) of the Bankruptcy Code in pertinent part provides that "[a]n allowed claim of a creditor secured by a lien on property . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim." 11 U.S.C. §506(a)(1).

So, it becomes necessary for the Court to determine the value of AVF's collateral (the Baymont Hotel) to determine the amount of the AVF secured claim. If the value of AVF's collateral is less than its debt, AVF is "undersecured" and has a secured claim to the extent of the value of its collateral and an unsecured claim for the remaining debt.

Section 506(a) of the Bankruptcy Code governs valuation of property, and in pertinent part provides that "value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest." 11 U.S.C. §506(a)(1). Judicial precedent requires that the "proposed disposition or use" of the collateral be of paramount importance in valuation. *Associates Commercial Corp. v. Rash*, 520 U.S. 953, 962 (1997); *see also In re T-H New Orleans Ltd. P'ship,* 116 F.3d 790, 799 (5th Cir. 1997) (value under §506 "is to be determined in light of the purpose of the valuation and of the proposed disposition or use of the property").

Here, the Debtor's Plan proposes the continued operation of the Baymont Hotel by the Debtor, and thus the Baymont Hotel should be valued in accordance with such proposed operational use. The only probative evidence presented at the Confirmation Hearing on the value of the Baymont Hotel was from a licensed real estate appraiser retained by AVF—Mr. Hinton. According to Mr. Hinton's written appraisal and testimony, the Baymont Hotel had a market value of $3.2 million as of October 18, 2012 using a blend of an income approach ($3.1 million) and a comparable sales approach ($3.35 million). *See* Appraisal (AVF Ex. 1). A hotel broker, Mr. Weir, testified for the Debtor that he would "list" the Baymont Hotel for sale at $4.8 million, and that in his opinion it would bring a "sales price" of $4.5 to $4.8 million. This evidence is not probative for at least two reasons. First, the Debtor's proposed use under the Plan is not to sell the Baymont Hotel—it is to continue to operate the Baymont Hotel. Second, the Court must disregard and will not consider Mr. Weir's opinion testimony regarding the "sales price" of the Baymont Hotel, for the reasons set forth earlier in the Findings of Fact in this Opinion.

In this setting, the value of the Baymont Hotel should be determined as of the date of the Confirmation Hearing on the Plan. Under §506(a) of the Bankruptcy Code, the court should determine value "in conjunction with any hearing on a plan affecting such creditor's interest". The date of the Confirmation Hearing on the Plan was April 25, 2013—more than six months after the October 18, 2012 effective date of Mr. Hinton's appraisal of the Baymont Hotel at $3.2 million. The evidence and independent statistics convinced the Court that the hotel market and the value of the Baymont Hotel have increased since October 2012, when the Austin hotel market reached its "tipping point". Indeed, at the Confirmation Hearing Mr. Hinton agreed that Austin hotels were now in a "good" market and that hotels in Austin have been rising in value since his October 2012 appraisal of $3.2 million. Mr. Weir (and statistics) convinced the Court that Austin is in the midst of an impressive "rising" hotel market that started to accelerate in the 4th quarter of 2012. There can be no real dispute that the Baymont Hotel has increased in value since October 2012 when Mr. Hinton performed his appraisal. However, Mr. Hinton expressed no opinion as to the updated value (in dollar figures) of the Baymont Hotel as of the Plan Confirmation Hearing on April 25, 2013.

Based on these facts and the evidentiary record, the Court will determine the value of the Baymont Hotel and the amount of the secured claim of AVF to be $3.2 million.[7] Normally, the Court would reduce the value of AVF's secured claim ($3.2 million according to Mr. Hinton's appraisal) by the amount of outstanding property taxes on the Baymont Hotel (approximately $68,000).[8] This is because property taxes are secured by a lien that is ahead of AVF's lien on the Baymont Hotel. *See* 11 U.S.C. §506(a) (a claim is a "secured claim to the extent of the value of such creditor's interest in the estate's interest in such property"). But, there can be no real dispute based on the record that the value of the Baymont Hotel has increased by at least $68,000 since the October 2012 appraisal by Mr. Hinton; and thus the Court will not reduce the amount of the secured claim of AVF by such $68,000 in property taxes. Accordingly, the Court concludes, for the purposes of §506(a) of the Bankruptcy Code, that AVF holds a secured claim is the amount of $3.2 million for the purposes of Plan confirmation and voting.

As the amount of AVF's secured claim ($3.2 million) is less than the total amount of its claim (about $3.8 million as of the bankruptcy filing date), AVF is "undersecured". It is therefore necessary to calculate the amount of AVF's unsecured claim for the purposes of the Plan confirmation and voting. The starting point is AVF's Proof of Claim in the amount of $3,815,355, which is the amount owed by the Debtor as of the bankruptcy filing date of October 2, 2012 (AVF Ex. 4). During the bankruptcy case and as of the April 25 Confirmation Hearing, the Debtor had made three adequate protection payments to AVF of $23,750 due on February 15, March 15, and April 15, 2013 under the Adequate Protection Order, with a fourth adequate protection payment becoming

---

[7] Though appraisal evidence is obviously important, Congress provided bankruptcy courts with some flexibility in determining valuation questions. *See In re Grind Coffee & Nash, LLC*, 2011 WL 1301357, *5 (Bankr. S.D. Miss. Apr. 4, 2011) (citing *T-H New Orleans,* 116 F.3d at 799).

[8] *See* Travis County Proof of Claim (claims dkt# 11-2).

due (and directed to be paid) on May 15, 2013 after the Confirmation Hearing. So, the amount of AVF's claim as of the bankruptcy filing date ($3,815,355) must be reduced by the amount of four adequate protections payments made to AVF during the bankruptcy of $23,750 (total of $95,000).[9] This leads to the conclusion that the total claim of AVF is currently the amount of about $3,720,355 ($3,815,355 minus $95,000 in adequate protection payments). The net result—AVF has an unsecured claim for about $520,355 ($3,720,355 outstanding total claim, minus $3.2 million secured claim, equals $520,355 unsecured claim).

In sum, the Court concludes that AVF has an allowed secured claim of $3.2 million to be treated and paid under Class 6 of the Debtor's Plan, and an allowed unsecured claim of about $520,355 to be treated and paid under Class 12 of the Debtor's Plan.

### D. **Necessity for Cramdown**

For a class of creditors to accept a plan of reorganization, §1126(c) of the Bankruptcy Code requires acceptance by creditors within a class totaling "at least two-thirds in amount and more than one-half in number" of creditors that vote. 11 U.S.C. §1126(c). Here, AVF holds a secured claim of $3.2 million and is the only creditor in Class 6 of the Plan. AVF voted to reject the Plan, and so Class 6 has rejected the Plan. Here, AVF also holds an unsecured claim of about $520,355 in Class 12 of the Plan and AVF voted to reject the Plan to the extent it is an unsecured creditor. Three other unsecured creditors in Class 12 (with claims totaling about $39,259) voted to accept the Plan (Debtor Ex. 31). With AVF's inclusion in Class 12 of a $520,355 unsecured claim, Class 12 has also rejected the Plan—as the requisite two-thirds in amount of voting creditors in Class 12 did not accept the Plan. 11 U.S.C. §1126(c).

Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims either accept a plan or not be impaired under the plan, for a plan of reorganization to be confirmed. 11 U.S.C. §1129(a)(8). The saving grace for a debtor to still confirm a plan over a rejecting class of creditors is §1129(b) of the Bankruptcy Code—known, in bankruptcy parlance, as "cramdown". Here, as Class 6 (secured claim) and Class 12 (unsecured claims) have rejected the Debtor's Plan due to AVF's votes against the Plan, the Debtor must "cramdown" both the secured class (Class 6) and the unsecured class (Class 12) to be able to confirm its Plan. This is a very difficult, yet not impossible, task for most debtors.

### E. **Cramdown of Secured Claim—§1129(b)(2)(A)**

To cramdown a rejecting (or dissenting) secured creditor class, the Bankruptcy Code requires that the plan of reorganization be "fair and equitable" to the secured creditor class. 11 U.S.C. §1129(b)(2). Specifically, with respect to classes of secured claims (like AVF's secured claim in Class 6), §1129(b)(2)(A) of the Bankruptcy Code

---

[9] As AVF is undersecured (its collateral is worth less than its debt), AVF is not entitled to recover post-petition, pre-confirmation interest or attorneys fees. *See* 11 U.S.C. §506(b).

provides in pertinent part:

> (A) With respect to a class of secured claims, the plan provides—
>
> > (i)     (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
> >
> > (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

11 U.S.C. §1129(b)(2)(A).

Here, the Debtor has requested that the Court "cramdown" AVF's secured claim (Class 6) and confirm its Plan under §1129(b)(2)(A)(i), because the Plan provides for deferred payment of AVF's secured claim in full (with 6% interest), and retention of AVF's lien.

The first cramdown requirement of §1129(b)(2)(A)(i) is that the secured creditor must "retain the liens" securing its secured claims. 11 U.S.C. §1129(b)(2)(A)(i)(I). The Debtor's Plan clearly meets this first cramdown requirement, as it expressly provides in Class 6 for retention of AVF's lien on the Baymont Hotel and any other collateral to secure AVF's secured claim, as well as AVF's unsecured claim. *See* Plan (dkt# 102, §6.06).

## 1. Cramdown Interest Rate

It is the second cramdown requirement—that set forth by §1129(b)(2)(A)(i)(II)—that is really in dispute in our case. In substance, this requires a debtor's plan to provide the secured creditor with deferred payments having a "present value" in the full amount of the creditor's secured claim. The Fifth Circuit has recently stated that "present value" in this context means the "deferred payments, discounted to present value by applying an appropriate interest rate (the 'cramdown rate'), must equal the allowed amount of the secured creditor's claim." *Wells Fargo Bank N. A. v. Texas Grand Prairie Hotel Realty, L.L.C. (In re Texas Grand Prairie Hotel Realty, L.L.C.)*, 710 F.3d 324, 330 (5th Cir. 2013).

So, in our case, the issue becomes whether the Debtor's Plan—which proposes a 6% interest rate to be paid to AVF on its $3.2 million secured claim—is an appropriate "cramdown interest rate" that will yield AVF at least the present value of its secured claim.

Notably, the Fifth Circuit has afforded bankruptcy courts discretion in determining a cramdown interest rate, and will not overturn such determination unless there is "clear error". *See Texas Grand*, 710 F.3d at 331 ("We will not tie bankruptcy courts to a specific methodology as they assess the appropriate Chapter 11 cramdown rate of interest; rather, we continue to review a bankruptcy court's entire cramdown-rate analysis only for clear error"); *T-H New Orleans*, 116 F.3d at 800 ("We will not tie the hands of the lower courts as they make the factual determination involved in establishing an appropriate interest rate; they have the job of weighing the witness' testimony, demeanor and credibility. Thus, absent clear error, we will not disturb the bankruptcy court's determination").

### 2. *Till* Formula Approach to Cramdown Interest Rate

For most courts, a cramdown interest rate methodology begins with review of the Supreme Court's plurality decision in *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004). In *Till*, the Supreme Court plurality adopted a "formula approach" (sometimes called the "prime-plus approach") to determine cramdown interest rates in a chapter 13 case. In short, the *Till* approach consists of starting with the national prime rate of interest and adjusting the prime rate upward for risk. 541 U.S. at 479–80. Following *Till*, bankruptcy courts struggled with whether to apply the *Till* approach in a Chapter 11 case, largely because of the now infamous footnote 14 in *Till*. Footnote 14 seemed to suggest that although in Chapter 13 (consumer) cases there is no efficient market of cramdown lenders, the same may not be true in Chapter 11 (business) cases, and thus "it may make sense to ask what rate an efficient market would produce" in determining a cramdown interest rate in Chapter 11 cases. *Till*, 410 U.S. at 477, fn. 14.[10]

In some respects, the Fifth Circuit clarified the muddy waters of *Till's* application to Chapter 11 cases in its 2013 decision in *Texas Grand*. First, the Fifth Circuit recognized that the *Till* "formula approach" to cramdown interest rates is not controlling precedent in a Chapter 11 case. Instead, many courts have followed the *Till* formula approach because they were persuaded by the *Till* plurality's reasoning, not because they considered it binding. *Texas Grand*, 710 F.3d at 331. Second, the Fifth Circuit noted that the *Till* formula approach has now become the "default rule" in Chapter 11 bankruptcies. 710 F.3d at 336. Third, the Fifth Circuit recognized that the "vast majority" of bankruptcy courts follow *Till* in determining a cramdown interest rate in Chapter 11. 710 F.3d at 333.

Perhaps this should come as no surprise. The Fifth Circuit addressed the issue of cramdown interest rates in Chapter 11 several years before the Supreme Court decision in *Till* and its recent decision in *Texas Grand*. In *T-H New Orleans*, the Fifth Circuit noted that the main objective of the bankruptcy court in determining the appropriate interest rate in a Chapter 11 cramdown is to arrive at a rate that reflects the present value of the claim and "accounts for the specific level of risk". 116 F.3d at 800–

---

[10] In *Texas Grand*, the Fifth Circuit recognized that footnote 14 in *Till* has been criticized as it rests on the untenable presumption that the voluntary market for a forced cramdown loan is less illusory in a Chapter 11 case than a Chapter 13 case. 710 F.3d at 336–37.

01. Similarly, in *In re Briscoe Enterprises Ltd., II*, 994 F.2d 1160, 1169 (5th Cir. 1993), the Fifth Circuit noted that a Chapter 11 cramdown interest rate should factor in the "appropriate risk". In many ways, the *Till* formula approach is consistent with these prior Fifth Circuit decisions—as the *Till* approach starts with the national prime rate and then adds a supplemental "risk adjustment". *Till,* 541 U.S. at 541; *Texas Grand*, 710 F.3d at 332.

But every rose has its thorn. This Court is mindful that the Fifth Circuit concluded its *Texas Grand* opinion with a statement that the Circuit was not suggesting that the *Till* formula approach is the "only—or even optimal" method for calculating a Chapter 11 cramdown interest rate. 710 F.3d at 337. And the parties in *Texas Grand* stipulated to the use of the *Till* formula approach—a stipulation that does not (apparently) exist in our case. 710 F.3d at 331.

Nevertheless, this Court is persuaded by *Till* and will use the *Till* formula approach as the path to evaluate the Debtor's proposed cramdown Chapter 11 interest rate in our case. The Court has chosen this path because the Fifth Circuit has consistently afforded bankruptcy courts discretion in determining a specific cramdown interest methodology, the Fifth Circuit has recently acknowledged in *Texas Grand* that the *Till* formula approach has become the "default rule" followed by a "vast majority" of courts in Chapter 11 cases, the Fifth Circuit reviewed the *Till* approach under a "clear error" standard in *Texas Grand*, and the *Till* formula approach appears consistent with prior Fifth Circuit precedent setting Chapter 11 cramdown rates based on risk.

### 3. Efficient Market

Some courts have held that a prerequisite to applying the *Till* formula approach in Chapter 11 is a finding that no "efficient market" exists for the cramdown loan, based on footnote 14 in *Till. See e.g., In re Brice Rd. Developments, LLC*, 392 B.R. 274, 280 (B.A.P. 6th Cir. 2008) (stating that in a chapter 11 case where an "efficient market" exists, the market interest rate should be applied; but where no "efficient market" exists, the formula approach to interest rates endorsed by the Supreme Court in *Till* should be applied).

The Fifth Circuit has recently recognized that, even assuming footnote 14 of *Till* has some persuasive value, most courts have held that an "efficient market" for financing exists in Chapter 11 only if the market offers a loan with a "term, size, and collateral comparable to the forced loan contemplated under the cramdown plan." *Texas Grand*, 710 F.3d at 337 (citing *In re 20 Bayard Views, LLC,* 445 B.R. 83, 110–11 (Bankr. E.D.N.Y. 2011); *In re SW Boston Hotel Venture,* 460 B.R. 38, 55 (Bankr. D. Mass. 2011) *vacated on other grounds,* 2012 WL 4513869 (B.A.P. 1st Cir. Oct. 1, 2012)). In that same vein, the Fifth Circuit also recognized that many courts (including the Sixth Circuit) have rejected the argument that the existence of "tiered financing" (such as a combination of senior debt, mezzanine debt, and equity financing) establishes that an "efficient market" exists. *Texas Grand*, 710 F.3d at 337 (citing *In re American HomePatient, Inc.*, 420 F.3d 559, 568–69 (6th Cir. 2005); *20 Bayard Views*, 445 B.R. at

110–11; *SW Boston Hotel Venture*, 460 B.R. at 55–58; Gary W. Marsh & Matthew M. Weiss, *Chapter 11 Interest Rates After Till*, 84 Am. Bankr. L.J. 209, 221 (2010)).  It is fair to say the courts "almost invariably conclude" that efficient markets are absent in a Chapter 11 case. *See Texas Grand*, 710 F.3d at 333 (supporting citations omitted).

Assuming, for the moment, that the lack of an "efficient market" is a predicate to applying the *Till* formula approach—the Court has little trouble concluding that no "efficient market" exists in this Debtor's case. The evidence presented by Mr. Weir, Mr. Hinton (AVF's appraiser) and Mr. Allen (AVF's representative) demonstrated that there are no loans in the current market for a loan-to-value ratio of 100% (1/1 loan), which is what the Debtor's Plan effectively proposes with respect to AVF's secured claim. According to Mr. Allen (AVF's representative), to obtain a loan contemplated by the Debtor's Plan in the market would require a combination of "tiered financing" with "mezzanine debt"[11] and likely some equity participation. This is exactly the kind of tiered financing that have led other courts to conclude that no "efficient market" exists for the cramdown loan. *See e.g., Texas Grand,* 710 F.3d at 337 (citing *American HomePatient*, 420 F.3d at 568–69 (holding that tiered financing—such as a combination of senior debt, mezzanine debt, and equity—demonstrates that no efficient market exists)).

### 4.  Application of *Till* Formula Approach

The starting point for the *Till* formula approach is the national prime rate of interest. *See Texas Grand*, 710 F.3d at 332 (where the Fifth Circuit stated "under the *Till* plurality's formula method, a bankruptcy court should begin its cramdown rate analysis with the national prime rate—the rate charged by banks to creditworthy commercial borrowers—and then add a supplemental risk adjustment"). As of the date of the Confirmation Hearing in our case, the evidence demonstrated that the national prime rate was 3.25%, and that rate had not changed in several years (Debtor Ex. 32). Thus, the Court will start with the prime interest rate of 3.25%, and adjust the prime rate upward for risk in this particular case.

According to the Supreme Court in *Till*, the appropriate size of the risk adjustment to the prime rate depends on such factors as (1) the circumstances of the bankruptcy estate; (2) the nature of the security; and (3) the duration and feasibility of the reorganization plan. *Till*, 541 U.S. at 479; *Texas Grand,* 710 F.3d at 332. In applying these factors, courts have generally approved upward "adjustments of 1% to 3%" to the prime rate. *See Texas Grand*, 710 F.3d at 332 (citing *Till*, 541 U.S. at 480); 710 F.3d at 333, 336 (collecting cases). Courts following the *Till* approach assess the risk of the debtor's default on the restructured obligations based on evaluating factors that include: (1) the quality of debtor's management; (2) the commitment of the debtor's owners; (3) the health and future prospects of the debtor's business; (4) the quality of the lender's

---

[11] "Mezzanine debt" is a form of subordinated debt, lying in priority somewhere between senior debt and equity. Unlike a mortgage loan (which is secured against the borrower's real estate and hard assets), mezzanine debt is typically secured by a borrower's equity in a real estate project, after accounting for existing prior indebtedness, or the borrower's stock itself. Jonathan Friedland, *Mezzanine Loans*, Strat. Alt. Dis. Bus. §13:6.

collateral; and (5) the feasibility and duration of the plan. *Texas Grand,* 710 F.3d at 334 (collecting cases).

The recent *Texas Grand* decision by the Fifth Circuit is quite illustrative of the application of the *Till* formula approach. In *Texas Grand*, the debtor was a hotel owner and operator, just as the Debtor is in this case. The debtor's plan proposed to pay its secured lender (Wells Fargo) over ten years with interest at 5%, which was 1.75% above the national prime rate of 3.25%. 710 F.3d at 327. The debtor's interest rate expert testified that a 5% interest rate was warranted based on various risk factors using the *Till* approach. The lender's expert testified that the interest rate should be 8.8%, using a market-based approach by taking a weighted average of interest rates the market would charge for a tiered financing package comprised of senior debt, mezzanine debt, and equity. 710 F.3d at 334–35. The Fifth Circuit affirmed the 5% cramdown interest rate to the lender, and held the bankruptcy court's application of the *Till* formula approach in approving a 5% cramdown interest rate under §1129(b) was not clearly erroneous. *Texas Grand*, 710 F.3d at 337.

In *Texas Grand*, the hotels were well-maintained, excellently managed, the debtor's owners were committed to the business, the debtor's revenues exceeded projections in the months before the confirmation hearing, the value of the hotels were stable or appreciating, and the debtor's plan was "tight but feasible". 710 F.3d at 334–35. Much of the same type of evidence is present in the Debtor's case—the Baymont Hotel is well managed, the Debtor's owners are committed to the business, the Debtor's recent revenues have exceeded projections, the Baymont Hotel is appreciating in value, and although the Debtor's Plan is tight, it is feasible.

The Court is not suggesting that the facts in our case are identical to those in *Texas Grand*. The Baymont Hotel is in average condition (and needs one more elevator upgrade, roof work, and some refurbishment), but the Debtor demonstrated that it will have the cash funds to make such upgrades and improvements during the life of the Plan—including from an equity infusion. AVF (the lender) is undersecured in our case; the lender in *Texas Grand* appears to have been fully secured. But given the structure of the Debtor's Plan, AVF actually benefits from having an unsecured claim—as AVF will receive a greater and faster paydown on its unsecured claim than its secured claim, while still retaining its lien. And of significance, the Debtor is proposing a higher cramdown interest rate in our case (6% interest) than the cramdown rate approved by the bankruptcy court and affirmed by the Fifth Circuit in *Texas Grand* (5% interest).

Here, the Court has considered and evaluated the circumstances of the Debtor's bankruptcy estate, the nature of AVF's collateral, the duration of the Debtor's Plan, and the feasibility of the Debtor's Plan—as required by the *Till* approach—which are more fully set forth in its Findings of Fact above. In short, the circumstances of the Debtor's bankruptcy estate have dramatically improved since its Chapter 11 filing, as the Debtor started with a negative cash position that has now grown to over $300,000 in cash on hand. The Debtor has positive cash flow even after making monthly adequate protection payments to AVF of $23,750 per month since February and upgrading one elevator.

During the bankruptcy case, the Debtor's estate has also funded an escrow account to pay for repairs (roof and another elevator upgrade) and 2013 property taxes. And upon confirmation of the Plan, the Debtor's members will make a significant cash equity infusion to the Debtor.

Meanwhile, the nature of AVF's collateral—the Baymont Hotel—is income-producing property that is appreciating in value for multiple reasons. In short, this is based on independent statistics, including the rising Austin hotel market and economy, the excellent location of the hotel, and its increasing revenues. The condition and value of AVF's collateral (the Baymont Hotel) will improve through the Plan, which includes an equity cash infusion for refurbishment and upgrade of the hotel. There are personal guarantees on the AVF debt and the Baymont Hotel is insured, providing additional safety for AVF.

Over the 5-year duration of the Debtor's Plan, the principal amount of AVF's secured and unsecured claims should be paid down by a total of almost $1 million on a monthly basis, plus AVF will be paid interest monthly on all principal. The Debtor's Plan provides for fixed and regular monthly payments to AVF of principal plus 6% interest on its claims. The Debtor's Plan revenue projections are conservative and its projected expenses are realistic and reasonable, which further reduces the risk of default. As discussed more fully below, the Debtor's Plan is feasible, but tight (particularly with respect to the refinancing or repayment of the balloon payment due in 5 years). However, in *Texas Grand,* the Fifth Circuit affirmed confirmation of a feasible but tight plan at a 5% cramdown interest rate. Here the Debtor proposes to pay AVF an even higher interest rate (6%).  The risk to AVF is also mitigated by the structure of the Debtor's Plan. If the Debtor defaults on payment of AVF's secured *or* unsecured claim, AVF can declare a default and after a short opportunity to cure, foreclose on its collateral (the Baymont Hotel) through non-judicial foreclosure—an expedient remedy.

The Court has also considered the quality of the Debtor's management, the commitment of the Debtor's owners, the health and future prospects of the Debtor's business, and the quality of AVF's collateral (the Baymont Hotel), as more fully set forth in its Findings of Fact above. In short, Ms. Rhee (the manager of the Baymont Hotel), appeared very credible and persuasive to the Court. She is well qualified and able to run a relatively small, limited service hotel, such as the Baymont Hotel. Ms. Rhee prepared the Debtor's Plan projections, and has been within the budget she prepared during the course of the bankruptcy—where actual income exceeded her projected income and actual expenses were about the same as her projected expenses. Ms. Rhee has carefully evaluated and identified refurbishment and repair projects at the hotel, and has budgeted and planned to address and pay for such projects under the Plan.

The Debtor's owners (which include Ms. Rhee) are committed to the Baymont Hotel and the Plan. Their commitment is demonstrated by their infusion of an additional $200,000 cash equity under the Plan, their initial outlay of about $1.8 million cash equity to acquire the hotel, and their unqualified support for the Plan and hotel.

The health and future prospects for the Baymont Hotel appear bright, based on credible testimony and independent statistics. The hotel is in a prime location, and has a diverse customer base with increasing room rates and revenues. The Baymont Hotel will be refurbished, which can only improve its future prospects. The hotel is in the midst of a "rising" hotel market in Austin, which will increase its value and improve its ability to obtain refinancing during the Plan term.

At the Confirmation Hearing, AVF argued that an appropriate cramdown interest rate would have to be in the "double digits" because with a loan to value ratio of 1/1, no one would lend to the Debtor without mezzanine debt and/or equity. AVF's argument flies in the face of the *Till* formula approach, which the Fifth Circuit recently pointed out in *Texas Grand*. The lender's interest rate expert in *Texas Grand* used a market-influenced, comparable loan approach with tiered financing to purportedly determine a cramdown interest rate under *Till*. *Texas Grand*, 710 F.3d at 334–35. The lender's approach was flatly rejected by the Fifth Circuit in *Texas Grand* and the Supreme Court plurality in *Till. See Texas Grand*, 710 F.3d at 336; *Till*, 541 U.S. at 477 (rejecting methodologies that require the bankruptcy courts to "consider evidence about the market for comparable loans", noting that such approaches "require an inquiry far removed from such court's usual task of evaluating debtors' financial circumstances and the feasibility of their debt adjustment plans"). AVF's reliance on comparable loans and tiered financing to determine a cramdown interest rate is not tenable.

At the Confirmation Hearing, AVF also argued the Debtor did not introduce specific evidence regarding the percentage increase associated with each relevant risk factor under the *Till* formula approach. AVF also seemed to imply that a true interest rate expert is required from a debtor to prove a cramdown rate. Although a true interest rate expert would be beneficial and welcomed by this Court, it does not believe such an interest rate expert (particularly in a smaller Chapter 11 case like this) is always necessary for a Debtor to establish a cramdown interest rate. Indeed, one of the Supreme Court's reasons for choosing the formula approach in *Till* was that the "formula approach entails a straightforward, familiar, and objective inquiry, and minimizes the need for potentially costly additional evidentiary proceedings." *Till*, 541 U.S. at 479. In addition, the Debtor did present evidence of the relevant risk factors, even if the Debtor did not attach a specific percentage of interest rate increase to each risk factor.[12] To require specific evidence tied to a percentage rate increase associated with every risk factor would complicate the *Till* formula by requiring non-experts to provide testimony on specific interest rate increases if the Debtor could not afford a true interest rate expert. This additional cost could be especially burdensome and unnecessary in smaller Chapter 11 cases like this one.

---

[12] According to the Fifth Circuit in *Texas Grand*, courts typically select a cramdown rate based on a "holistic" assessment of the risk of the debtor's default while evaluating several factors. 710 F.3d at 333. The word "holistic" means an analysis of the whole, rather an analysis of its parts— which would seem to refute the notion that each risk factor must be assigned a specific percentage of increase to the prime rate. MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 593 (11th ed. 2003).

### 5. Conclusion—Cramdown of Secured Claim

In summary, for the Court to find that the Debtor's proposed 6% cramdown interest rate for AVF's secured claim under Class 6 is sufficient to provide AVF with the "present value" of its claim under the *Till* approach, the Court would have to assess a risk adjustment of no more than 2.75% above the prime rate of 3.25%. Based on the risk factors discussed above, the Court believes that the risk adjustment to the 3.25% prime rate need not exceed 2.75%, and could have been a slightly lower risk adjustment under the facts and circumstances of this particular case. The Court also notes that a risk adjustment of 2.75% added to the prime rate is on the higher side of the 1% to 3% general range above the prime rate that courts have often approved as a cramdown rate in other cases. *See Texas Grand*, 710 F.3d at 335–36 (collecting cases).

For the reasons set forth in this Opinion, the Court concludes that the Debtor's proposed 6% cramdown interest rate on AVF's secured claim in the Plan provides AVF with at least the "present value" of its secured claim. Under the facts and circumstances of this particular case, the 6% interest rate proposed by the Plan for AVF's secured claim in Class 6 is slightly more than sufficient to support cramdown of AVF's secured claim. Therefore, the Debtor's Plan interest rate of 6% satisfies the second requirement for a secured creditor cramdown set forth by §1129(b)(2)(A)(i)(II), and the Plan may be confirmed over the rejecting Class 6 creditor AVF.

### F. Cramdown of Unsecured Claims—§1129(b)(2)(B)

AVF also voted to reject the Debtor's Plan as an unsecured creditor. As set forth above, the Court has determined that AVF has an unsecured claim of about $520,355 that is treated under Class 12 of the Plan. AVF's rejection of the Plan caused the unsecured creditor Class 12 to reject the Plan, given the amount of AVF's unsecured claim.

To cramdown a rejecting (or dissenting) unsecured creditor class, the Bankruptcy Code requires that the plan of reorganization be "fair and equitable" to the unsecured creditor class. 11 U.S.C. §1129(b)(2). Specifically, with respect to classes of unsecured claims (like AVF's unsecured claim in Class 12), §1129(b)(2)(B) of the Bankruptcy Code provides in pertinent part:

With respect to a class of unsecured claims—

(i)     the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii)     the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property…

11 U.S.C. §1129(b)(2)(B).

Here, the Debtor has requested that the Court "cramdown" the unsecured class (Class 12) and confirm its Plan under §1129(b)(2)(B)(i) because the Plan provides for deferred payment of AVF's unsecured claim in full, with 6% interest. Specifically, the Debtor's Plan proposes to pay AVF's unsecured claim with 6% interest, in 60 equal monthly installments sufficient to pay off the entire unsecured claim with interest in full in 5 years. *See* Plan (dkt# 102, §6.12). Notably, AVF will retain its lien on the Baymont Hotel and any other collateral to secure payment of both its secured claim and unsecured claim under the Plan. *See* Plan (dkt# 102, §6.06).

### 1.  Cramdown Interest Rate—*Till* Formula Approach

Section 1129(b)(2)(B)(i) requires a debtor to provide "present value" of deferred payments to unsecured claims it seeks to cramdown. Courts have also applied the *Till* formula approach to determine the "cramdown interest rate" for unsecured claims. *See e.g.*, *In re Texas Star Refreshments, LLC*, 2013 WL 1197672 (Bankr. N.D. Tex. Mar. 22, 2013); *In re Renegade Holdings, Inc.*, 429 B.R. 502, 523–25 (Bankr. M.D.N.C. 2010). This makes sense because the statutory language in §1129(b)(2)(B)(i) of the Bankruptcy Code (governing cramdown of unsecured claims) is virtually identical in material respects to that of §1129(b)(2)(A)(i)(II) (governing cramdown of secured claims)

### 2.  Application of *Till* Formula Approach

Here, the Debtor's Plan proposes the same interest rate—6%—on both AVF's unsecured claim (Class 12) as AVF's secured claim (Class 6). While providing an unsecured creditor with the same risk adjustment as a secured creditor under the *Till* approach may, on its face, appear to ignore that unsecured debt may be inherently riskier than secured debt, this is not necessarily the situation based on the facts in this Debtor's case.

Indeed, at least one court has approved a cramdown interest rate for an unsecured claim at *less than* the interest rate for a secured claim. *See Texas Star*, 2013 WL 1197672, at *15–16. In *Texas Star,* the debtor's plan proposed paying its major secured creditor in full over seven years at 5.25% interest. *Texas Star*, 2013 WL 1197672, at *1. On the other hand, the debtor's plan proposed to pay its largest unsecured creditor over seven years at 5% interest, with a balloon payment at the end of the seventh year. *Texas Star*, 2013 WL 1197672, at *1. Although the parties did not present any direct evidence regarding the appropriate interest rate for the unsecured creditors, the court found that 5% interest for unsecured creditors was appropriate under a *Till* approach, even though it was less than the interest rate given to the debtor's largest secured creditor. *Texas Star,* 2013 WL 1197672 at *15. The *Texas Star*

court reached this conclusion, in part, by focusing on the relative risks of plan confirmation compared with liquidation. As the court stated, "[a]n unsecured creditor's prospects of repayment may indeed be enhanced if the debtor survives and the only real alternative is liquidation". *Texas Star*, 2013 WL 1197672 at *15. The same could be said in the Debtor's case because AVF will receive more on its unsecured claim through confirmation of the Debtor's Plan—100% payment of about $520,355 over 5 years in equal monthly payments with interest—than it would through liquidation. In a liquidation scenario, AVF would foreclose on the Baymont Hotel and likely receive no more than about $3.2 million (according to AVF's own appraised value of the Baymont Hotel) and little or nothing on its $520,355 unsecured claim from the Debtor.

In *Renegade Holdings*, the court approved a 4.25% cramdown interest rate for unsecured creditors where the unsecured creditors would receive no payment until 3 years after plan confirmation and a sizable portion of the payment was deferred until the final and seventh year of the plan. 429 B.R. at 524. In stark contrast, the Debtor here is proposing to pay AVF's unsecured claim in equal monthly installments of principal and interest at 6% starting immediately. The *Renegade Holdings* court recognized that "several of the risk factors articulated in the *Till* opinion are equally relevant in a case involving unsecured claims", but other factors, such as "the nature of security, rate of collateral depreciation and liquidity of the collateral market do not impact an unsecured creditor's risks and are not relevant." 429 B.R. at 527. The remaining factors significantly overlap with the factors used to determine whether a plan is feasible. Applying these factors, the *Renegade Holdings* court found the debtors' projections were reasonable and included modest revenue gains, the debtors projected substantial cash on hand to overcome any profit shortfall, and the debtors' management appeared capable of responding to future problems. Therefore, the *Renegade Holdings* court ultimately held the 4.25% cramdown interest rate for unsecured claims was appropriate under the *Till* formula approach. 429 B.R. at 528.

Returning now to the specifics of the Debtor's case and application of the *Till* formula approach, AVF's unsecured claim has less risk and more protection than most unsecured claims for several reasons. Significantly, the Debtor's Plan expressly provides that AVF's lien on the Baymont Hotel will continue to secure and protect its unsecured claim. *See* Plan (dkt# 102, §6.06). There is no attempt by the Debtor to "strip down" AVF's lien on the Baymont Hotel to secure just AVF's $3.2 million secured claim. *See e.g.*, *In re Heritage Highgate, Inc.*, 679 F.3d 132, 143–45 (3d Cir. 2012) (permitting lien stripping on Chapter 11 debtor's real estate based on value of real estate at plan confirmation date, rendering lien creditor unsecured by the real estate after plan confirmation); *In re Bartee*, 212 F.3d 277, 291 fn. 21 (5th Cir. 2000) (recognizing the Supreme Court decision in *Dewsnup*, which restricted lien stripping, was expressly limited to Chapter 7 liquidation cases and is inapplicable to the reorganization bankruptcy chapters like Chapter 11).[13] There is no lien stripping under the Debtor's

---

[13] *See also* 11 U.S.C. §1123(b)(5) (which permits a plan to "modify the rights of holders of secured claims"); 11 U.S.C. §1129(b)(2)(A)(i)(I) (generally permitting cramdown if lien is retained to extent of secured claim); 11 U.S.C. §506(d) (which provides to "the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void").

Plan—instead the exact opposite is true. AVF's unsecured claim is expressly secured and protected by a lien on the Baymont Hotel under the Plan and AVF will benefit from the appreciation in value of the Baymont Hotel that will over time secure its unsecured claim.

Just as importantly, the Debtor's Plan provides that if the Debtor defaults in payment of either AVF's secured claim or unsecured claim, AVF will have the right to exercise its state law remedies, including foreclosure of its lien on the Baymont Hotel. *See* Plan (dkt# 102, §12.01, §6.06). It will be relatively simple for AVF to collect and enforce its lien rights in the event of default in payment of AVF's unsecured claim, as Texas is a non-judicial foreclosure state.

With respect to other *Till* risk adjustments, AVF's unsecured claim of about $520,355 will be paid off at a faster rate than its $3.2 million secured claim, which reduces risk. Under the Debtor's Plan, AVF's unsecured claim will be paid off in 60 equal monthly installments (5-year amortization) of principal and interest. AVF should receive about $10,062 a month in payment of principal and interest on its $520,355 unsecured claim. In contrast, AVF's secured claim of $3.2 million will receive monthly payments based on a 25-year amortization (about $20,617 a month), with a balloon at the end of 60 months for the unpaid balance. AVF actually benefits from having an unsecured claim under this particular Plan, because the total monthly payments that AVF should receive from the Debtor on its $3.2 million secured claim and its $520,355 unsecured claim should total about $30,679 a month (about $20,617 a month on AVF's secured claim and about $10,062 a month on AVF's unsecured claim). On the other hand, if AVF had no unsecured claim and instead had only a $3.8 million secured claim, AVF would receive only about $24,582 a month from the Debtor due to the 25-year amortization of the secured claim. *See* Plan Projections (Debtor Ex. 4). Furthermore, the approximately $30,679 total monthly payment AVF should receive under the Plan on its secured claim and unsecured claim, is more than the $29,247 monthly payment under the Debtor's original promissory note to Wilshire State Bank which AVF acquired. *See* AVF Proof of Claim (AVF Ex. 4).

All of these risk adjustment factors (and those already set forth by the Court with respect to cramdown of AVF's secured claim) combined with the Baymont Hotel's appreciating value, increasing revenue stream, and substantial cash equity infusion, provide AVF's unsecured Class 12 claim with enough protection and no undue risk that would require cramdown interest in excess of 6%.

Finally, it must also be noted that the starting point for a *Till* analysis—the national prime rate of 3.25%—already has some risk built into it. *See e.g., Koopmans v. Farm Credit Services of Mid-Am., ACA*, 102 F.3d 874, 875 (7th Cir. 1996) (holding prime rate includes some compensation for the risk of non-repayment). Given this, some courts have started their upward risk adjustment not from the prime rate; but rather from the much lower and "risk-free" U.S. Treasury Bill rate. *See e.g., In re SJT*

*Ventures, LLC*, 441 B.R. 248, 255–56 (Bankr. N.D. Tex. 2010).[14] As of April 25, 2013, the 5-year U.S. Treasury Bill rate (a truly riskless rate) was 0.71%.[15] Although this Court will not go that far today by starting its upward risk adjustment from the Treasury Bill rate, it merely serves to demonstrate that AVF is receiving over a 5% upward risk adjustment above a truly riskless rate on its unsecured claim.

### 3. Conclusion—Cramdown of Unsecured Class

In summary, for the Court to find that the Debtor's proposed 6% cramdown interest rate for AVF's unsecured claim under Class 12 is sufficient to provide AVF with the "present value" of its unsecured claim under the *Till* approach, the Court would have to add a risk adjustment of no more than 2.75% above the prime rate of 3.25%. Under the facts and circumstances of this particular case and based on the risk and factors discussed in this Opinion, the Court believes the risk adjustment to the 3.25% prime rate should be 2.75% for AVF's unsecured claim, yielding a 6% cramdown interest rate as proposed in the Debtor's Plan.

Accordingly, the Court concludes that the Debtor's proposed 6% cramdown interest rate on AVF's unsecured claim provides AVF with the "present value" of its unsecured claim in this particular and relatively unique case. Therefore, the Debtor's Plan satisfies the requirement for a cramdown of an unsecured creditor class set forth by §1129(b)(2)(B)(i), and the Plan may be confirmed over the rejecting Class 12 that includes AVF.[16]

### G. Feasibility of Plan—§1129(a)(11)

AVF has also objected to confirmation of the Debtor's Plan on the basis that it is not feasible. The feasibility requirement is codified in §1129(a)(11) of the Bankruptcy Code, which requires that "confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor." 11 U.S.C. §1129(a)(11); *In re Save Our Springs (S.O.S.) Alliance Inc.*, 632 F.3d 168, 172 (5th Cir. 2011).

---

[14] Indeed, in the words of the Fifth Circuit, the Treasury Bill rate "includes all necessary factors except the risk premium". *Briscoe Enterprises, Ltd.*, 994 F.2d at 1169.

[15] Daily Treasury Yield Curve Rates, http://www.treasury.gov/resource-center/data-chart-center/interest-rates/Pages/TextView.aspx?data=yieldYear&year=2013.

[16] To be clear, the Court is not finding that both a secured claim and an unsecured claim are entitled to the same cramdown interest rate. The Court did not require the Debtor to provide AVF's Class 6 secured claim with a 6% interest rate. Instead, the Court has concluded that the 6% interest rate proposed for secured claim of AVF in Class 6 was slightly ***more*** than sufficient under this particular case to support cramdown of AVF's secured claim; and that 6% was the appropriate cramdown rate on AVF's unsecured claim in Class 12.

Essentially, this confirmation requirement concerns whether the debtor can realistically carry out its plan. *See In re Lakeside Global II, Ltd.*, 116 B.R. 499, 506 (Bankr. S.D. Tex. 1989). In determining plan feasibility, bankruptcy courts have often examined the following factors: (1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management; and (6) any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan. *In re M & S Associates, Ltd.*, 138 B.R. 845, 849 (Bankr. W.D. Tex. 1992). However, there is no requirement that the Court consider all six of these factors. *See Save Our Springs*, 632 F.3d at 173.

Though a guarantee of success is not required, the bankruptcy court should be satisfied that the reorganized debtor can stand on its own two feet. *See Lakeside Global,* 116 B.R. at 506, fn. 19 (citing *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 378 (1988)). Speculative, conjectural, or unrealistic projections by a debtor cannot support a debtor's prediction of future performance. *See Save Our Springs,* 632 F.3d at 172; *In re Canal Place Ltd. P'ship*, 921 F.2d 569, 579 (5th Cir. 1991).

AVF cites to the *M & S Associates* and *Lakeside Global* decisions to support its argument that the Debtor's Plan is not feasible. However, both of these cases are readily distinguishable from our case. In *M & S Associates*, the debtor presented little evidence regarding the feasibility of its plan, the debtor did not introduce its financial projections into evidence, and the debtor's plan provided for "negative amortization" of the secured debt. *M & S Associates*, 138 B.R. at 849–52. In contrast, here the Debtor provided detailed and realistic Plan projections, in both written form that were admitted into evidence (Debtor Ex. 4) and through the testimony of Ms. Rhee (manager of the Debtor and Baymont Hotel). Mr. Weir (an experienced Austin hotel broker and consultant) independently corroborated the Debtor's Plan projections, and testified that the Baymont Hotel's revenue projections were conservative and the hotel's actual revenues should exceed the Plan projections. And the Debtor's Plan here does not provide for anything close to "negative amortization" for AVF; indeed, the Debtor is proposing a 6% interest rate (paid monthly) and a paydown of principal to AVF of almost $1 million together with interest over the life of the Plan.

In *Lakeside Global*, the court found the earning power of the business to be questionable because the debtor experienced a substantial income shortfall based on its budgeted projections, missed payments to its first lienholder, and the debtor's representative testified that it was questionable whether the debtor would be able to make future payments to its first lienholder. *Lakeside Global*, 116 B.R. at 508. Again, the evidence in the Debtor's case is in stark contrast to the evidence in *Lakeside Global*. In our case, the Debtor has consistently made the adequate protection payments to its lienholder AVF during its bankruptcy case, has gone from a negative cash position when it filed bankruptcy to over $300,000 in cash on hand, has outperformed its projected monthly revenues, and presented persuasive and substantial evidence regarding the Baymont Hotel's future profitability, including detailed and credible 5-year

projections.

AVF (understandably) expresses concern with respect to the Debtor's ability to pay or refinance the balloon payment due on AVF's secured claim by the end of the 5-year Plan term. Several considerations allay this concern in this particular case. AVF's debt will have been paid down almost $1 million in principal on its secured and unsecured claims (plus about $900,000 in interest) over 5 years in regular monthly payments under the Plan. This would leave a balance of about $2.8 million due to AVF at the time of the 5-year balloon under the Plan. But as the Baymont Hotel's value and revenue continues to increase in the rising Austin hotel market along with the hotel updates funded by the Debtor's Plan, the Debtor's loan-to-value ratio should continue to improve substantially. This makes it much more likely that the Debtor will be able to refinance within 5 years (or even sell the hotel and payoff AVF in full). For example, with only $2.8 million in secured debt required to be refinanced in the final year of the Plan, the Baymont Hotel's value would need to be approximately $3.5 million in 5 years to achieve the 80 to 100 loan-to-value ratio that Mr. Weir and Mr. Hinton both stated are available in the market. To achieve this 80 to 100% ratio, the Baymont Hotel's value would have to increase by only about 2% annually to be worth at least $3.5 million in 5 years—a quite likely and conservative projection based on the facts in this case.

The Debtor's business has sufficient earning power, as demonstrated by the realistic and conservative Plan projections based on recent performance and the rising hotel market in Austin. The Debtor's actual 2013 revenue is already on pace to exceed its Plan projections revenue for 2013. Currently, the Debtor has over $300,000 in cash on hand.

The Plan provides for a $200,000 cash equity contribution from the Debtor's members upon confirmation. Although AVF contends that the $200,000 cash contribution by the members is illusory, the evidence at the Confirmation Hearing established otherwise. The $200,000 cash in members' contributions is already in the trust account of Debtor's counsel awaiting Plan confirmation. Further, the members would lose their interest in the Debtor if they removed their contribution, and the Court would likely revoke Plan confirmation or convert the case to Chapter 7 if the contributions are not timely made. Finally, all of the Debtor's members voted to accept the Plan, and each member signed and is bound by the Debtor's Plan (dkt# 102). Under these circumstances, the members' equity contribution of $200,000 in cash is not illusory.

Economic conditions, with respect to Austin hotels in general and the Baymont Hotel in particular, are bright. The rising hotel market in Austin, demonstrated by independent statistics, shows no signs of abating anytime soon. With respect to the Debtor's capital structure, the Debtor's Plan projections show that, including the $200,000 equity infusion by the Debtor's members, by May 2013 (the projected Plan effective date) the Debtor will have $473,726 in cash on hand (Debtor Ex. 4). In addition to the $473,726 in projected cash on hand, at the projected Plan effective date the Debtor will have the amount of $70,558 in escrow to upgrade the hotel's second

elevator (estimated to cost $38,000) and to pay 2013 property taxes when due.

Ms. Rhee has shown to be a capable and competent manager of a limited service hotel like the Baymont Hotel. It is likely that Ms. Rhee will stay in management throughout the Plan term, given her financial and personal commitment to the hotel. Other factors that weigh in favor of the Plan's feasibility include the rising hotel market in Austin that has resulted in increased revenues for the Baymont Hotel, the improving local economy, and the Baymont Hotel's affordable, competent management.

Under the Debtor's Plan projections (that assumed AVF has a $615,355 unsecured claim that will be paid in full with interest over 5 years and a $3.2 million secured claim) the Debtor projects to have at least $118,848 in cash on hand at the end of the Plan's 5-year term (Debtor Ex. 4). The projected cash on hand at the end of the Plan term would likely be higher, as AVF's unsecured claim to be paid over 5 years with interest is probably closer to the amount of $520,355 calculated above, than the $615,355 used in the Plan projections. Nonetheless, with the size of AVF's unsecured claim at about $520,355 to be paid in equal monthly installments over 5 years, in some years the Debtor's cash reserves may dip to or slightly below $100,000. *See* Debtor's Plan Projections (Debtor Ex. 4). This, in the Court's view, together with the balloon payment of about $2.8 million due at the end of 5 years, makes the Plan somewhat tight, but still feasible.

For these reasons and those previously stated by the Court in this Opinion, the Court concludes that the Debtor's Plan is feasible and the Plan confirmation requirement of §1129(a)(11) of the Bankruptcy Code has been met by the Debtor.

### H. Good Faith—§1129(a)(3)

AVF has also objected to confirmation of the Debtor's Plan on the basis that the Debtor did not propose the Plan in "good faith". One of the statutory requirements for confirmation of a plan of reorganization is that a debtor's plan be "proposed in good faith and not by any means forbidden in law". 11 U.S.C. §1129(a)(3). According to the Fifth Circuit, the bankruptcy judge is "in the best position to assess the good faith of the parties' proposals." *Jasik v. Conrad (In re Jasik)*, 727 F.2d 1379, 1383 (5th Cir. 1984).

The Fifth Circuit has stated that the good faith requirement must be "viewed in the light of the totality of the surrounding establishment of a Chapter 11 plan" and that a court must keep in mind that the purpose of the Bankruptcy Code is "to give debtors a reasonable opportunity to make a fresh start." *T-H New Orleans*, 116 F.3d at 802. The good faith requirement does not mean the plan must be one which the creditors themselves would design. What is required is that a plan (1) be proposed with the legitimate and honest purpose to reorganize; and (2) have a reasonable hope of success. *T-H New Orleans*, 116 F.3d at 802.

Contrary to AVF's contention, the Debtor's Plan does not place all, or even an undue risk, on AVF. The Debtor's members are putting up another $200,000 in cash

equity under the Plan, in addition to the $1.8 million equity that they have previously provided to the Debtor. The risk in this Plan is where it should be—on the Debtor's members and equity holders. The Debtor's Plan provides AVF with a fair and equitable interest rate, substantial monthly payments secured by collateral that is appreciating in value, and an expedient remedy if a default were to occur.

For the reasons already set forth extensively in this Opinion, the Debtor has a reasonable ability to reorganize and successfully complete its Plan, and the Debtor proposed the Plan with a legitimate and honest purpose to reorganize the Baymont Hotel. The Court easily concludes that the Debtor's Plan is proposed in good faith and that the requirement of §1129(a)(3) of the Bankruptcy Code has been met.

### I.  Other Plan Confirmation Requirements

#### 1.  Best Interests Test—§1129(a)(7)

Section 1129(a)(7) requires a plan of reorganization meet the "best interests" test, which requires that each dissenting creditor receive at least as much as they would in a hypothetical Chapter 7 liquidation of the Debtor. 11 U.S.C. §1129(a)(7)(A). No objection to Plan confirmation on this ground was asserted by AVF. Under a hypothetical Chapter 7 liquidation of the Debtor, the only creditor who would receive payment would be AVF, likely through foreclosure on the Baymont Hotel, although even AVF would not be paid in full because it is currently undersecured. In comparison, under the Debtor's Plan, all creditors (including AVF) will be paid in full over 5 years with interest, which is clearly more than they would receive in a hypothetical liquidation. The Debtor has also provided a hypothetical liquidation analysis, which the Court finds to be credible. *See* Amended Disclosure Statement (Debtor Ex. 2, dkt# 84, pp. 11–12). The Court concludes that the requirement of §1129(a)(7) of the Bankruptcy Code has been satisfied with respect to the Debtor's Plan.

#### 2.  Impaired Accepting Class—§1129(a)(10)

Section 1129(a)(10) of the Bankruptcy Code requires that if a class of claims is impaired under the plan, "at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider." 11 U.S.C. §1129(a)(10). In our case, two impaired classes of non-insiders— Class 7 and Class 11—accepted the Debtor's Plan. *See* Ballot Summary (Debtor Ex. 31, dkt# 100). Accordingly, the Court concludes that the Plan confirmation requirement of §1129(a)(10) has been satisfied by the Debtor.

#### 3.  Plan Modification—§1127

Section 1127 of the Bankruptcy Code permits the proponent of a plan to modify "such plan at any time before confirmation". 11 U.S.C. §1127(a). Bankruptcy Rule 3019 further provides if the court finds "that the proposed modification does not adversely change the treatment of the claim of any creditor or the interest of any equity security

holder who has not accepted in writing the modification, it shall be deemed accepted by all creditors and equity security holders who have previously accepted the plan." Fed. R. Bankr. P. 3019(a); *In re Am. Solar King Corp.*, 90 B.R. 808, 826 (Bankr. W.D. Tex. 1988) (if a modification does not "materially" impact a claimant's treatment, the change is not adverse and the court may deem that prior acceptances apply to the modified plan).

Here, the Debtor solicited votes from creditors and interest holders on its First Amended Plan of Reorganization (dkt# 73). Subsequently, the Debtor made two modifications to such First Amended Plan—by filing a Second Amended Plan of Reorganization (dkt# 92) and then its Modified Second Amended Plan of Reorganization (herein "Plan") (dkt# 102)—prior to confirmation. Such modifications added 6% interest to be paid to unsecured creditors (Class 12) and clarified the scope of AVF's lien retention and default remedies (Class 6). Thus, the Court concludes that the modifications do not adversely change the treatment of any creditor or interest holder, and all creditors and interest holders who previously accepted the First Amended Plan of Reorganization are deemed to accept the Modified Second Amended Plan of Reorganization (herein "Plan") (dkt# 102).

### 4.  Additional Plan Confirmation Requirements—§1129

The evidence established, and there appears to be no dispute, that the other requirements for confirmation of the Debtor's Plan set forth in §1129 and all other applicable provisions of the Bankruptcy Code have been satisfied.

## V.
## CONCLUSION

In the refuge of Chapter 11, this case presents the Court with the unusual legal setting of a debtor attempting to cramdown both secured and unsecured claims—and actually succeeding. Based on the extensive evidence presented by the Debtor at the Confirmation Hearing, which included independent statistics demonstrating the rising hotel market in Austin, credible Plan projections, and cash equity infusion, the Court is satisfied that the Debtor will be able to make the Plan work and successfully reorganize its hotel business. In conclusion, the Court will confirm the Debtor's Plan and deny AVF's Objection to the Plan.

Within 14 days after entry of this Opinion, Debtor's counsel is requested to submit a proposed form of Order confirming the Debtor's Modified Second Amended Plan of Reorganization (dkt# 102) (herein "Plan") which incorporates this Opinion by reference.

###